**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

ASCEND MEDIA PROFESSIONAL
SERVICES, LLC,

        **Plaintiff,**

        **v.**                        **Case No.  06-2350-JWL**

EATON HALL CORPORATION, et al.,

        **Defendants.**

_____

**MEMORANDUM AND ORDER**

This lawsuit arises out of plaintiff Ascend Media Professional Services, LLC's purchase of a trade show and conference business from defendants Eaton Hall Corporation, Eaton Hall Management, LLC, and Scott Goldman (collectively, "Eaton Hall").[1] This trade show and conference, known as the "Food Safety Summit" (FSS), was conducted annually by Eaton Hall through the 2005 FSS.  In January of 2006, Eaton Hall sold the FSS business to Ascend pursuant to a series of contracts.  The subsequent FSS in 2006 turned out to be not as profitable as anticipated, and Ascend now asserts various breach of contract claims against Eaton Hall arising from the contract terms pursuant to which Ascend purchased the FSS business from Eaton Hall.  Eaton Hall, in return, asserts a counterclaim against Ascend for reimbursement of certain expenses it incurred in connection with the 2006 FSS.

_____

[1] At all relevant times, Mr. Goldman was the sole shareholder of Eaton Hall Corporation and the sole member of Eaton Hall Management, L.L.C.

This matter is currently before the court on Eaton Hall's motion for summary judgment (doc. #45). For the reasons explained below, the court will grant this motion in part and deny it in part. Specifically, the motion is denied with respect to Ascend's claim concerning Mr. Goldman's preparation of the budget for the 2006 FSS. It is granted as to Ascend's breach of contract claims based on the attrition charge under the hotel block agreement, disclosure of the top twenty-five customers, disclosure of agreements with exhibitors that included complimentary items, breach of the implied covenant of good faith and fair dealing, and insofar as Ascend is seeking restitution for Mr. Goldman's alleged breach of the consulting agreement.

## STATEMENT OF MATERIAL FACTS

Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to Ascend, the nonmoving party.

## I.     Eaton Hall's Sale of the FSS Business to Ascend

In 1999, Eaton Hall organized and conducted the first annual Food Safety Summit trade show and conference in Washington, DC. Thereafter, Eaton Hall conducted the FSS annually through 2005. By 2005, the FSS was recognized as the nation's largest annual trade show and conference dedicated to food quality assurance, sanitation, maintenance, and food security. The event is targeted at food industry professionals. It has two aspects: a trade show and an educational conference. The FSS derives its revenues from fees paid by

2

sponsors, fees paid by exhibitors, and through revenues generated by those attending the FSS conference and trade show.  From 2002 through 2005, the FSS showed consistent growth: its annual revenue increased from $536,080 to $1,077,410; its annual gross profit increased from $110,944 to $523,171; its annual gross profit margin increased from 21% to 48.5%; its annual number of paid exhibitors increased from 134 to 192; and, its annual number of paid conference attendees increased from 431 to 983.  After the 2003 FSS and 2005 FSS, the Tradeshow Week Magazine accredited the FSS as "One of 50 Fastest Growing Shows in the U.S."

In 2002, Ascend was formed by Cameron Bishop, Dan Altman, and Ronald Wall. From Ascend's inception, Mr. Bishop has been its CEO and President and Mr. Wall has served as its Executive Vice President of Sales and Marketing.  By 2005, Ascend had acquired various businesses and divisions.  One of these was a food, beverage, and packaging division known as Stagnito Communications.  At the urging of Harry Stagnito, President of Stagnito Communications, the decision was made for Ascend to pursue acquisition of the FSS business from Eaton Hall because it would compliment Stagnito's food and beverage division.  On October 11, 2005, Ascend issued a letter of intent to Eaton Hall to purchase the FSS business.  After the letter of intent was issued, the parties began the due diligence process.

Ascend retained the accounting firm of Weiser, LLP, to review and analyze Eaton Hall's books and records.  Ascend also secured the services of the law firm Lathrop & Gage, PC to perform due diligence concerning the FSS business.  It is uncontroverted that Eaton

Hall provided all requested due diligence information to Weiser, Lathrop & Gage, and Ascend; that in Mr. Bishop's deposition he could not identify any information that Eaton Hall provided that was false or inaccurate; and that, in fact, the due diligence information that Eaton Hall provided to Ascend was true and accurate.  The Ascend board of directors was satisfied with the information provided in due diligence and it came to a consensus to approve the acquisition.

On or about January 9, 2006, the parties executed and closed on a series of agreements pursuant to which Ascend purchased the FSS business from Eaton Hall.  These agreements included the following: Asset Purchase Agreement (APA); Escrow Agreement among Ascend, Eaton Hall, and UMB Bank, N.A. as escrow agent; assignment document conveying the business assets to Ascend; Consulting Agreement between Mr. Goldman, Eaton Hall Corporation, and Ascend; Sales Commission Agreement between Mr. Goldman and Ascend; and Sales Commission Agreement between Michael Peck (an employee of Eaton Hall) and Ascend regarding the 2006 FSS.  Under the Asset Purchase Agreement, Eaton Hall sold substantially all of the assets related to the FSS business to Ascend.  The aggregate purchase price for the FSS business was $3.3 million, subject to certain price adjustments.

## II.    The Asset Purchase Agreement (APA)

Under the APA, Ascend acquired "all contracts to which Seller is a party and which are utilized in the conduct of the" FSS business, including the "contracts set forth in Section 1.1(a)(i) of the Seller Disclosure Schedule."  That Seller Disclosure Schedule includes Eaton Hall's "Exhibitor Sales and Receivables Report," and identifies all of Eaton Hall's exhibitor

contracts for the 2006 FSS as of January 3, 2006, and sets forth the amount that exhibitors agreed to pay, any payments made, and any balance due and owing by the exhibitor. There is no evidence that the information contained in the schedule is incorrect. As part of the transaction, Ascend also assumed certain liabilities of Eaton Hall "arising in connection with the operation of the" FSS business, including the obligations of the exhibitor contracts identified on the Exhibitor Sales and Receivables Report. As part of the APA, Eaton Hall represented that except as was disclosed in the "Seller Disclosure Schedule, there are no liabilities against, relating to, or affecting the Business or any of the Assets, other than Liabilities (i) incurred in the ordinary course of business consistent with past practice or (ii) which individually or in the aggregate, are not material to the condition of the Business."

    A.    *The 2006 Budget*

The APA included a copy of Eaton Hall's budget for the 2006 FSS that set forth actual expenses and revenues incurred to date, as well as projected future expenses and revenues for the period after January 3, 2006, leading up to the 2006 FSS to be held on March 21-23, 2006. With regard to the budget for the 2006 FSS, the APA provides as follows:

> **2.21**  **2006 Show Budget.**  Section 2.21 of the Seller Disclosure Schedule contains a true and complete copy of Seller's budget for the 2006 Food Safety Summit show to be held March 22-24, 2006 in Las Vegas, NV (the "2006 Budget"). The information contained in the 2006 Budget was prepared in good faith and upon the reasonable assumptions and expectations of the management of Seller. Neither Seller nor Shareholder has Knowledge of any facts or circumstances currently in existence or that could reasonably be expected to occur in the future, involving grantors, sponsors, customers, suppliers, competitors, Laws or Orders, that would have the effect of causing the Business not to meet the revenue, earnings and other targets set forth in the 2006 Budget.

The economic performance of the 2006 FSS did not meet the 2006 Budget projections.

Mr. Goldman prepared the 2006 Budget referenced in this provision and attached as Section 2.21 of the Seller Disclosure Schedule.  This budget projected a growth in exhibitor revenue.  When Mr. Goldman was asked in his deposition upon what he based this projected growth, he replied as follows:

> A general growth rate as well as the fact that Stagnito had, again, indicated that they would bring resources to bear in the form of their salespeople, who would call on people we hadn't been calling on or even had in our prospect database, altogether new companies that we've never made an effort to sell to that Stagnito felt that they could bring into the fold and get as customers.

Mr. Goldman testified that he was not sure of the exact number he used in projecting his growth rate from "the Stagnito contribution."  In projecting sponsorship revenue for the 2006 show, he based his estimate of sponsorship revenue upon what Stagnito could bring to the table.  According to a memorandum prepared by him on January 5, 2006, Eaton Hall had "sponsorship proposals pending with three major food ingredient suppliers (Kraft, ConAgra, and Cargill)."  Those sponsorships "needed the assistance of Stagnito in order to happen" because Eaton Hall "had no relationship with those companies on the marketing side and Stagnito did."  Mr. Goldman prepared his budget for the 2006 show based upon an understanding that the FSS would land one or more of the sponsorship proposals with Kraft, ConAgra, or Cargill.  He testified in his deposition that he would have prepared his budget differently if he understood on January 9, 2006, that the Stagnito Group would not have been able to get any additional sponsorship revenue for the 2006 FSS.

6

Mr. Bishop testified in his deposition that Ascend would have paid substantially less for the FSS business if Ascend would have acquired the event after the 2006 show because of the lower profit numbers of the 2006 FSS. He specifically testified that if the "multiple of profitability" that was used in Ascend's purchase price was applied against what was actually realized for the 2006 FSS, "there would be far greater damages than the 300,000." He hypothesized that if Ascend had acquired the business after the 2006 FSS, Ascend would have paid $1.8 million less. One of Ascend's employees, Scott Wolters, testified in his deposition that there was nothing Ascend could have done to help it achieve the revenue projections for the 2006 FSS. According to him, Ascend did everything within its power to maximize revenues for the 2006 FSS. Yet, the 2006 FSS ultimately reported total revenue of only $1,027,826.

Eaton Hall points out that on the 2006 Budget, all projected revenues for the period after January 3, 2006, were designated as "estimated," and the 2006 Budget is footnoted with the following statement: "All estimated revenues are predictions, and may not actually materialize." Mr. Bishop testified in his deposition that he has no information or evidence (1) that Eaton Hall failed to prepare the 2006 Budget in good faith, (2) that the 2006 Budget did not reflect Mr. Goldman's actual expectations for the 2006 FSS, or (3) that Eaton Hall had knowledge of circumstances that would result in the 2006 FSS not meeting the 2006 Budget.

     B.     *Mandalay Bay Hotel Agreement*

Two of the contracts that Ascend acquired and assumed under the APA were: (1) the Convention Center License Agreement between Eaton Hall and Mandalay Bay Corp., and (2) the Letter Agreement between Eaton Hall and Mandalay Bay Corp. regarding hotel, food, and beverage commitments for the 2006 FSS.  The hotel agreement set aside a block of hotel rooms at the Mandalay Bay Resort & Casino from which attendees and exhibitors for the 2006 FSS could reserve rooms.  In the event that the entire hotel block set aside under the agreement was not sold, Ascend was required to pay an attrition charge for those rooms that the Mandalay Bay could not otherwise sell.  The agreement provided that on or before September 20, 2005, the existing unsold hotel block could be reduced up to fifteen percent. Thereafter, until February 20, 2006, the existing unsold hotel block could be reduced up to another fifteen percent.  Eaton Hall produced a copy of this hotel agreement for Ascend's review during due diligence, and Ascend had an opportunity to review the terms and status of the agreement.  On November 14, 2005, a copy of the hotel agreement was delivered to Ascend's lawyers as part of their due diligence review.

It is undisputed that Eaton Hall did not exercise the first option to reduce the hotel block on or before September 20, 2005.  In February of 2006, Ascend exercised the second option to reduce the existing hotel block by fifteen percent.  Ascend ultimately paid Mandalay Bay a net attrition charge of $37,000 for unused hotel rooms.

C.     *Top Twenty-Five Customers*

Under the APA, Eaton Hall made certain disclosures regarding Eaton Hall's "exhibitors/customers/sponsors" of the prior 2005 FSS and the upcoming 2006 FSS, as follows:

> **2.20**   <u>**Substantial Exhibitors/Customers/Sponsors.**</u>  <u>Section 2.20(a) of the Seller Disclosure/Schedule</u> lists the twenty-five (25) largest exhibitors/customers/sponsors providing funding to the Business on the basis of revenues for each of the current and most recently-completed fiscal years. Except as disclosed in <u>Section 2.20(a) of the Seller Disclosure Schedule</u>, no such exhibitor/customer/sponsor has ceased or reduced its funding commitment to, purchases from or use of the services of the Business since the Show Cycle Commencement Date, or to the Knowledge of Seller, has threatened to cease or reduce any such activity after the date hereof or in connection with the transactions contemplated hereby.  Except as disclosed in <u>Section 2.20(a) of the Seller Disclosure Schedule</u>, to the Knowledge of Seller, no such exhibitor/customer/sponsor is threatened with bankruptcy or insolvency.

Eaton Hall's disclosures under § 2.20 of the APA are set forth at Disclosure Schedule 2.20 of the APA, and specifically reference and include the "Exhibitor Sales and Receivables Report," a list of the "Top 25 Customers for 2006," and a list of the "Top 25 Customers for 2005 Show."  Mr. Bishop cannot identify any information in these disclosures that was incorrect.

Section 2.7 of the APA provides that except as is disclosed in § 2.7 of the Seller Disclosure Schedule, since April 1, 2005, "there has not been any material adverse change, or any event or development which, individually or together with other such events, could reasonably be expected to result in a material adverse change, in the condition of the" FSS business.  Disclosure Schedule 2.7 is attached to the APA and specifically discloses that the

Food Safety Magazine, which has been an exhibitor at previous FSS trade shows, had ceased participating as an exhibitor and had started operation of a competing trade show.

> D.    *Complimentary Exhibitor Items*

For prior FSS events, as part of the ordinary course of Eaton Hall's business practices regarding exhibit booth sales, Eaton Hall would sometimes agree to allow exhibitors certain complimentary booth furnishing items such as free carpet, furniture, drapes, etc. as a marketing tool. Examples of this practice for the 2005 FSS are shown on exhibitor contracts included at Exhibit 49 that were provided to Ascend and its accounting firm during due diligence. Copies of exhibitor contract information that Eaton Hall provided to Ascend's law firm on January 8, 2006, also showed that certain exhibitors' contracts provided them with such complimentary items.

After Ascend acquired the FSS business, sales of exhibit space for the 2006 FSS continued, and exhibitor contracts entered after January 9, 2006, also allowed exhibitors complimentary items.

## III.    **The Consulting Agreement**

As part of the transaction, Eaton Hall Corporation, Mr. Goldman, and Ascend also entered into a Consulting Agreement. The Consulting Agreement provides that between January 9, 2006, and March 31, 2006, Mr. Goldman was to "fulfill all of the duties set forth on the attached 'Schedule A' to the Consulting Agreement." Schedule A to the Consulting Agreement specifically identifies the items that Mr. Goldman was to perform under the Consulting Agreement. Ascend contends that $100,000 of the $3.3 million purchase price

for the FSS business was allocated to the Consulting Agreement as payment for services thereunder.

Ascend hired Scott A. Wolters to serve as the director of trade shows and conferences. He started employment at Stagnito Communications on February 13, 2006. When Mr. Wolters was hired, he understood that his duties with respect to the 2006 FSS were to attend the event, observe, and meet sponsors, exhibitors, and attendees. He was told that he would have an observation role with respect to the 2006 FSS. But, after he was hired, he felt that he needed to take a more active role in the 2006 FSS. This was because when he began calling around to introduce himself to the "various vendors and venues and participants in the event," he "quickly ascertained that many of them were without information or proper direction necessary to properly execute the event." Soon after he began working for Stagnito, Mr. Goldman took a vacation and was out of pocket for some period of time in February of 2006. Mr. Goldman specifically testified in his deposition that when Mr. Wolters came on board, he assumed some of the duties that were listed under "Operations" on Schedule A to the Consulting Agreement.

Additionally, one of the duties listed under "Meeting Planning" on Schedule A to the Consulting Agreement listed "Arrange for VIP Dinner" with a target date of January 16. Mr. Goldman worked with the meeting planner, CNS Consulting Group, to identify potential off-site venues for a planned VIP dinner for the 2006 FSS. They submitted three potential venues for the dinner to Mr. Wolters for his approval. Ascend made the decision to cancel the offsite VIP dinner as of March 2, 2006. Ascend points out that the email communication

11

cited by Eaton Hall is dated February 16, 2006, which indicates that Mr. Goldman was working to coordinate the VIP dinner approximately a month later than the target date.

**IV.**   **Ascend's Demand for Indemnification**

Included in the agreements executed on January 9, 2006, was an Escrow Agreement pursuant to which $300,000 of the purchase price paid by Ascend was held in escrow by UMB Bank, against which Ascend could make a claim for indemnity under the terms of Article 11 of the APA.  On July 7, 2006, Ascend provided Eaton Hall with a formal indemnity notice in accordance with § 11.1(a) of the APA in which Ascend alleged that Eaton Hall had breached the APA, and demanded that the $300,000 held in escrow be disbursed to Ascend.  On August 1, 2006, Eaton Hall rejected Ascend's request for indemnity and payment of the funds held in escrow.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).  An issue of fact

12

is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

13

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

# DISCUSSION

For the reasons explained below, Eaton Hall's motion for summary judgment is granted in part and denied in part. It is denied with respect to Ascend's claim concerning Mr. Goldman's preparation of the budget for the 2006 FSS because genuine issues of material fact exist concerning whether Mr. Goldman prepared the 2006 Budget in good faith and whether his assumptions and expectations in preparing the budget were reasonable. Ascend has not, however, submitted a summary judgment record that creates genuine issues of fact concerning its claims based on the attrition charge under the hotel block agreement, disclosure of the top twenty-five customers, disclosure of agreements with exhibitors that included complimentary items, breach of the implied covenant of good faith and fair dealing, and insofar as Ascend is seeking restitution for Mr. Goldman's alleged breach of the consulting agreement. Accordingly, the court will grant summary judgment on those claims.

## I.      Breach of the Asset Purchase Agreement (APA)

In the pretrial order, Ascend claims that Eaton Hall breached the terms of the APA in several different respects. Eaton Hall now seeks summary judgment on four of those theories. Specifically, it contends that it is entitled to summary judgment on Ascend's claims

that it breached the APA in the following respects: (1) by representing and warranting that the 2006 FSS would achieve revenues in the amount of approximately $1,275,000 even though it was not trending anywhere near that at the time of the projection; (2) by failing to give the Mandalay Bay hotel timely notice of a reduction in the hotel block for the 2006 FSS; (3) by failing to disclose that several customers listed in the Top 25 customer list for 2005 would not be exhibiting in the 2006 FSS; and (4) by failing to disclose side agreements with exhibitors and sponsors at the 2006 FSS as required by the APA.

A.      *Failure to Meet Budget*

Ascend's largest monetary claim of approximately $250,000 arises from Eaton Hall's alleged breach of § 2.21 of the APA.  Therein, Eaton Hall made the following representation and warranty to Ascend:

> **2.21    2006 Show Budget.**  Section 2.21 of the Seller Disclosure Schedule contains a true and complete copy of Seller's budget for the 2006 Food Safety Summit show to be held March 22-24, 2006 in Las Vegas, NV (the "2006 Budget").  The information contained in the 2006 Budget was prepared in good faith and upon the reasonable assumptions and expectations of the management of Seller.  Neither Seller nor Shareholder has Knowledge of any facts or circumstances currently in existence or that could reasonably be expected to occur in the future, involving grantors, sponsors, customers, suppliers, competitors, Laws or Orders, that would have the effect of causing the Business not to meet the revenue, earnings and other targets set forth in the 2006 Budget.  Based on the performance of the Business for pre-2006 show to date and Seller's and Shareholder's reasonable expectations for the performance of the Business for the remainder of the 2006 show period, the Business is expected to meet the revenue, earnings and other targets set forth in the 2006 Budget.

The 2006 Budget attached to the APA estimated total revenues in the amount of $1,274,403.97 for the 2006 FSS.[2]  In Ascend's profit and loss statement after the 2006 FSS, it identified total FSS revenue in the amount of $1,027,826.  This was a revenue shortfall of $246,577.97 from the amounts identified in the 2006 Budget disclosed in the APA, which amounts to a variance of 19.3% between budget and actual.

Eaton Hall seeks summary judgment on the grounds that it did not warrant that the economic performance of the 2006 FSS would in fact meet the projections set forth in the 2006 Budget.  It points out that it was required under § 2.21 of the APA to prepare the budget in good faith and upon reasonable assumptions and expectations.  Eaton Hall contends that its preparation of the 2006 Budget met this standard.  In support of this argument, Eaton Hall points out that it based its attendee and exhibitor revenue projections and its expense projections upon its historic trends for the FSS and applied the same growth rates.  It also considered various other factors such as the anticipated positive economic impact that conducting the 2006 FSS in Las Vegas, Nevada, instead of Washington, DC (as it had been in the past) would have on attendee revenue.  Eaton Hall contends that, based on these types of considerations, the summary judgment record establishes that Eaton Hall analyzed and considered relevant factors and arrived at the 2006 Budget projections based upon its assumptions, expectations, and past experience.  Thus, Eaton Hall argues that it is entitled

---

[2] Actually, it estimated total revenues of $1,399,403.97, but Ascend is not claiming any damages attributable to the $125,000 budgeted as logistics pavilion revenues.  Thus, the relevant estimated revenue budget number is $1,274,403.97 ($1,399,403.97 minus $125,000).

to summary judgment because the facts demonstrate that there is no issue of material fact that its 2006 Budget satisfied the good faith requirement of § 2.21 of the APA.

Certainly, a rational trier of fact viewing the summary judgment record in the light most favorable to Eaton Hall could conclude that Eaton Hall prepared the 2006 Budget in good faith and upon its reasonable assumptions and expectations.  But, whether the good faith standard was met is a question for the trier of fact.  *CIT Group/Sales Financing, Inc. v. E-Z Pay Used Cars, Inc.*, 29 Kan. App. 2d 676, 680, 32 P.3d 1197, 1202 (2001); *St. Catherine Hosp. v. Rodriquez*, 25 Kan. App. 2d 763, 765, 971 P.2d 754, 756 (1998); *Hartford v. Tanner*, 22 Kan. App. 2d 64, 69, 910 P.2d 872, 876 (1996).[3]  And, at the summary judgment phase the court must of course view the facts in the light most favorable to Ascend.  Viewed as such, a rational trier of fact could conclude that Mr. Goldman's preparation of the 2006 Budget did not comply with the good-faith-and-reasonableness standard set forth in § 2.21 of the APA and, consequently, constituted a breach of the APA.

Ascend points out that Mr. Goldman's 2006 Budget calculations were based on anticipated revenues that could be realized only if the sales transaction with Ascend went through.  Mr. Goldman testified in his deposition that he budgeted exhibitor revenue for the 2006 FSS based on his understanding of the resources that the Stagnito Group would bring to the table after the purchase.  He also budgeted additional sponsorship revenue for the 2006 FSS based on his understanding that the Stagnito Group would bring certain resources and

---

[3] The APA provides that it shall be governed by and construed in accordance with Kansas law.

relationships to the FSS. Eaton Hall contends that it was reasonable for Mr. Goldman to rely on these considerations because at the time the budget was prepared in early January of 2006 Mr. Goldman anticipated that within days the FSS business was going to be sold to Ascend; thus, including in the 2006 Budget additional revenue that would be realized in light of the Stagnito Group's resources reflected Mr. Goldman's reasonable expectations about the 2006 FSS. Section 2.21 of the APA, however, does not by its plain language specify whether the 2006 Budget was supposed to reflect revenue numbers that Mr. Goldman would have projected if Eaton Hall had continued to own the FSS or whether those numbers permissibly took into account the anticipated post-sale marketing and promotional capabilities of Stagnito Communications. The APA simply states that the 2006 Budget was to be based on Mr. Goldman's "reasonable" assumptions and expectations.

A rational trier of fact viewing the summary judgment record in the light most favorable to Ascend could conclude that Mr. Goldman's preparation of the 2006 Budget in reliance on post-sale contingencies was unreasonable. This is partly because the purchase price that Ascend paid to Eaton Hall for the FSS business was based on a multiple of budgeted revenues for the 2006 FSS. Consequently, Mr. Goldman had a motive to prepare an optimistic budget because it justified a higher sale price for the FSS. A rational trier of fact could decide that it was unreasonable for Eaton Hall to seize credit for any net benefit that Ascend (through its division Stagnito Communications) would later bring to the 2006 FSS. Additionally, it is noteworthy that the budgeted revenue was off nearly 20%, which is a significant number.

In sum, the summary judgment record contains sufficient evidence to create a genuine issue of material fact concerning whether Mr. Goldman prepared the 2006 Budget in good faith and whether his assumptions and expectations in preparing the budget were reasonable. Accordingly, this aspect of Eaton Hall's motion for summary judgment is denied.

2.      *Attrition Charge Under Hotel Block Agreement*

Ascend is seeking $37,000 that it paid in hotel attrition charges to Mandalay Bay that Ascend contends were a direct result of Eaton Hall's failure to take a reduction in the hotel room block by September 20, 2005. Ascend contends that Eaton Hall could have and should have exercised the fifteen percent reduction in the room block by executing the first option on September 20, 2005, to reduce the hotel room block under the Mandalay Bay hotel agreement. In support of this argument, Ascend relies on § 1.2(a)(i) of the APA. Under that provision, Ascend assumed at closing the contractual liabilities of Eaton Hall relating to the FSS "arising and to be performed on or after the Closing Date, and **excluding any such obligations arising or to be performed prior to the Closing Date**" (emphasis added). Relying on this emphasized language, Ascend contends that Eaton Hall's option to reduce the hotel block by fifteen percent was an obligation under the Mandalay Bay contract which was supposed "to be performed prior to the Closing Date."

Ascend's logic on this aspect of its breach of contract claim is without merit for two obvious reasons. First, the clause in the Mandalay Bay agreement did not impose any obligation on Eaton Hall to reduce the hotel room block by September 20, 2005. It simply provided that Eaton Hall "may" reduce the room block by up to fifteen percent. Thus, Eaton

19

Hall did not have an "obligation arising or to be performed [under the Mandalay Bay agreement to reduce the hotel block] prior to the Closing Date" in January of 2006.  Second, Ascend has not directed the court's attention to any provision in any contract between the parties that would have obligated Eaton Hall to exercise this option.  In fact, the summary judgment record establishes that no contract whatsoever existed between Ascend and Eaton Hall on September 20, 2005.  It would therefore be illogical to imply that Eaton Hall had any such retroactive obligation.  Because the attrition charge is an obligation that arose after closing, then, it is a liability that Ascend assumed under the APA.  Accordingly, Ascend has not raised a genuine issue of triable fact that Eaton Hall owed it any contractual obligation as of September 20, 2005, and therefore summary judgment is granted on this aspect of Eaton Hall's motion.

        *C.*      *Disclosures Regarding the Top Twenty-Five Customers*

Eaton Hall seeks summary judgment on Ascend's claim that Eaton Hall breached § 2.20 of the APA by failing to disclose that several customers listed in the top twenty-five customer list for 2005 would not be exhibiting in the 2006 FSS.  In support of this portion of Eaton Hall's motion, Eaton Hall has submitted uncontroverted facts establishing that the information set forth in Seller Disclosure Schedule 2.20 regarding the list of the twenty-five largest exhibitors/customers/sponsors for 2005 and 2006 and related information was accurate and satisfied the provisions of § 2.20 of the APA.  Ascend presents no argument in opposition to this portion of Eaton Hall's motion.  Because Ascend has not raised a genuine

issue of material fact that Eaton Hall breached this provision of the APA, then, this aspect of Eaton Hall's motion for summary judgment is granted.

D.      *Disclosure of Agreements With Exhibitors that Included Complimentary Items*

Ascend contends that Eaton Hall breached the APA by failing to disclose certain side agreements with exhibitors and sponsors at a cost to Ascend of approximately $6,600. Eaton Hall seeks summary judgment on this claim on the ground that it disclosed its agreements with those exhibitors as required and/or it was not required to disclose such complimentary booth furnishing items because those liabilities were incurred in the ordinary course of business consistent with past practice. Under § 2.8 of the APA, liabilities "incurred in the ordinary course of business consistent with past practice" were not required to be disclosed. In response, Ascend contends that those side deals should have been disclosed on § 1.1(a)(i) of the Seller's Disclosure Schedules. Ascend's argument is without merit. Under the APA, Ascend assumed Eaton Hall's assets and liabilities in connection with the FSS business, including those "Business Contracts" disclosed in § 1.1(a)(i) of the Seller Disclosure Schedule. It is uncontroverted that the Seller Disclosure Schedule lists all of the exhibitor contracts in place at the time of closing and it is also uncontroverted that those exhibitor contracts contain the "side deals" upon which Ascend's claim is based. That is all that is required under the APA. Additionally, Eaton Hall has also submitted uncontroverted facts in support of its summary judgment motion establishing that these types of complimentary items were provided to exhibitors in the ordinary course of business consistent with past practice, and therefore they were not required to be disclosed. In sum, Ascend has not

directed the court's attention to any contractual provision and/or facts in the summary judgment record from which a rational trier of fact could conclude that Eaton Hall breached any particular provision of the APA by failing to disclose any side agreements with exhibitors regarding complimentary booth furnishing items. Accordingly, this aspect of Eaton Hall's motion for summary judgment is granted.

## II.     Breach of the Covenant of Good Faith and Fair Dealing

Ascend asserts a claim against Eaton Hall based on breach of the covenant of good faith and fair dealing. This claim is premised on the notion that at the time of closing, the 2006 FSS was fast approaching only approximately two months later; because the FSS was almost ready to take place the parties understood that Eaton Hall would assume primary responsibility for developing, producing, and marketing the 2006 FSS; and Ascend suffered damages when Eaton Hall failed to take primary responsibility for managing the 2006 FSS. Eaton Hall specifically seeks summary judgment on this claim on the ground that neither the implied covenant of good faith and fair dealing nor the Consulting Agreement impose these types of broad, general, and undefined post-sale obligations upon Eaton Hall. Because Eaton Hall met its initial summary judgment burden of pointing out a lack of evidence on this claim, then, the summary judgment burden shifts to Ascend to set forth specific facts showing that there is a genuine issue for trial on this claim. Ascend did not present any argument or opposition to this specific portion of Eaton Hall's motion. As such, Ascend has not met the burden necessary for it to withstand summary judgment and Eaton Hall's motion for summary judgment on this claim is granted.

### III.    Restitution for Breach of the Consulting Agreement

Ascend claims that Mr. Goldman breached the Consulting Agreement by failing to honor his obligations under the agreement in a timely and reasonable fashion.  Eaton Hall's motion for summary judgment is not directed to the substantive merits of this claim.  In fact, by Mr. Goldman's own admission during his deposition he did not complete some of the duties that, under the Consulting Agreement, he was supposed to "cause [Ascend] to fulfill . . . [as] set forth on the attached Schedule A."  Specifically, he did not complete the majority of the tasks listed under the "Operations" heading on Schedule A; he acknowledged that those tasks were taken over by Mr. Wolters after he started working for Ascend.  The summary judgment record also contains evidence from which a rational trier of fact could conclude that Mr. Goldman was untimely in attempting to coordinate an off-site VIP event.  Instead of Eaton Hall's motion for summary judgment on this claim being directed to the merits of the claim itself, with respect to this claim Eaton Hall moves for summary judgment insofar as Ascend is seeking damages for this alleged breach under a theory of restitution (as opposed to the actual damages that it arguably sustained).

Eaton Hall argues that Ascend cannot be entitled to restitution because it is uncontroverted that Mr. Goldman at least partially performed the Consulting Agreement.  In support of this argument, Eaton Hall relies on the principle that restitution is available as a remedy for breach of contract only if the breach gives rise to a claim for damages for total breach or repudiation and not merely to a claim for damages for partial breach.  *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 630 (2000); Restatement

23

(Second) of Contracts § 373(1) & cmt. a (1981).  In response to Eaton Hall's argument on this point, Ascend does not even purport to argue that Mr. Goldman's conduct constituted a total breach so as to give rise to a claim for restitution.  Instead, Ascend expressly concedes that it "does not contend that Mr. Goldman ignored all of his duties under the Consulting Agreement."  The facts as admitted by Ascend, then, establish that Mr. Goldman's conducted amounted at most to only a partial breach of the Consulting Agreement and not a total breach or repudiation that would give rise to a valid claim for restitution.  Consequently, Ascend has not established the existence of a genuine issue of fact sufficient for its restitution claim to survive summary judgment.  Accordingly, this aspect of Eaton Hall's motion for summary judgment is granted.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (doc. #45) is granted in part and denied in part as set forth above.

**IT IS SO ORDERED** this 29th day of January, 2008.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

24